IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.                                                              CASE NO.  1:05cr479-RLH/AJB

HARRISON NORRIS, JR.,

    Defendant.

_____/

## ORDER DENYING THE § 2255 MOTION

    A grand jury indicted the defendant Harrison Norris, Jr. on 28 counts arising from an operation in which Mr. Norris held women against their will and forced them to engage in prostitution.  After a 10-day trial, the jury convicted Mr. Norris on 24 counts and acquitted him on 4.  Mr. Norris appealed.  After a remand and resentencing, Mr. Norris appealed again.  The Eleventh Circuit affirmed.

    Mr. Norris now has moved for relief under 28 U.S.C. § 2255.  He alleges that the judge who presided over the trial—but not the resentencing—was biased or was impaired by his neurological condition and mental health.  The judge, Jack T. Camp, later resigned and pleaded guilty to criminal charges.  In the course of the criminal conduct, Judge Camp made comments suggesting bias against African American men in relationships with white women.  He may have made comments

showing broader racial bias.  Judge Camp's comments apparently included a specific reference to Mr. Norris, though not by name.  Mr. Norris is African American, and some of his victims were white.

After reviewing the entire 2,367 page transcript, I deny relief.

I

The second superseding indictment charged Mr. Norris with one conspiracy count and 27 substantive counts.  The crux of the charges was that Mr. Norris held specific women at his residence against their will and took them to other locations—usually starting at night clubs—for the purpose of prostitution.  The government also presented evidence that Mr. Norris forced some of the women to have sex with him.

The crux of Mr. Norris's defense was that the women were in training at his residence as wrestlers.  Mr. Norris was himself a former professional wrestler and had wrestling facilities, including a ring, at his residence.  Mr. Norris asserted that the women were free to leave and that they engaged in prostitution—if at all—on their own, without his involvement.  He asserted that any sex between him and the women was voluntary.

The evidence was easily sufficient to go to the jury, that is, to allow a reasonable jury to conclude beyond a reasonable doubt that Mr. Norris was guilty. Indeed, the evidence included eye-witness testimony of most of the victims.  The

jury convicted Mr. Norris on all but the four counts involving one specific alleged victim who did not testify.

II

Mr. Norris chose to represent himself at trial. As would be expected for any *pro se* defendant, Mr. Norris was not fully conversant with the rules of procedure and evidence. Judge Camp was extraordinarily respectful of, and patient with, Mr. Norris. A good judge might well *aspire* to be so respectful and patient. For his part, Mr. Norris was himself respectful of Judge Camp and the process. As *pro se* trials go, this was a good one.

Now represented by an attorney on the § 2255 motion, Mr. Norris has not cited any ruling Judge Camp made, or anything Judge Camp did or said, that showed bias, lack of expertise, or poor judgment. Mr. Norris has not criticized Judge Camp's actual performance in any respect. My own review of the transcript shows no ground for criticism. I would not have done everything exactly as Judge Camp did—no two judges would ever handle a case in precisely the same way— but I saw nothing suggesting I could have conducted a fairer trial or that I could have obtained a more just or reliable verdict. In short, there is no basis for concluding that Judge Camp's views or health influenced the verdict. And the sentence is unassailable; it was imposed by a different judge, whose ability and impartiality have not been questioned.

The issue, then, is whether the later revelations about Judge Camp—criminal conduct, comments suggesting racial bias, and an alleged history of mental-health deficiencies—entitle Mr. Norris to relief without a showing of any actual effect on Mr. Norris's case.

### III

The parties have cited no case, and I am aware of none, addressing circumstances quite like these.  But the reported decisions provide guidance.

First, in *Bracy v. Gramley*, 520 U.S. 899 (1997), a judge "thoroughly steeped in corruption" was convicted of taking bribes from defendants in murder cases.  The judge presided over Mr. Bracy's murder trial during the same time period.  Mr. Bracy asserted the judge was biased against defendants who did not pay bribes; Mr. Bracy said this was an effort to appear tough on crime and thus to camouflage the judge's bribery-induced pro-defendant bias in other cases.  Mr. Bracy cited specific rulings that he said showed bias.

The Supreme Court said bias of this kind would violate the Due Process Clause.  The Court explained, "[T]he floor established by the Due Process Clause clearly requires a 'fair trial in a fair tribunal,' . . . before a judge with no actual bias against the defendant or interest in the outcome of his particular case." *Id*. at 904-05 (quoting *Withrow v. Larkin*, 421 U.S. 35, 46 (1975), and citing *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 821-22 (1986), and *Tumey v. Ohio*, 273 U.S. 510, 523

(1927)).  Based on Mr. Bracy's substantial showing, the Supreme Court held he was entitled to an evidentiary hearing.

More recently, in *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009), the Supreme Court reviewed a state supreme court's reversal of a judgment in a civil case.  The defendant's chief executive officer made an extraordinary contribution to the campaign of a candidate for the state supreme court while it was foreseeable that the case would come before the court (and thus would come before the candidate, if elected).  The candidate won in a close election, and the state supreme court reversed the judgment on a 3–2 vote, with the new justice in the majority.  The United States Supreme Court reversed without finding actual bias.  The Court said there are "instances which, as an objective matter, require recusal.  These are circumstances 'in which experience teaches that the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable.' "  *Id*. at 877 (quoting *Withrow*, 421 U.S. at 47).

These decisions establish that the Due Process Clause may be violated when the judge is actually biased in a specific respect and even when, without a showing of *actual* bias, objective circumstances show an unacceptable *probability* of bias.  The Supreme Court has never held, though, that either an *appearance* of bias or a *possibility* of bias, without more, establishes a due-process violation.  *See Davis v. Jones*, 506 F.3d 1325, 1333-37 (11th Cir. 2007) (rejecting a state habeas

petitioner's appearance-of-bias claim for lack of supporting Supreme Court authority; citing circuit decisions suggesting that an appearance of bias is not a due-process violation).

IV

Here Judge Camp had no financial or other interest in the outcome of the case. Nobody has suggested he was engaged in criminal conduct—or anything improper—at the time of Mr. Norris's trial. For all that was known then or has been proffered now, Judge Camp was an experienced district judge with a long history of impeccable service.

Later, nearly three years after this trial, Judge Camp engaged in egregious misconduct. Mr. Norris has proffered facts based on the record in *United States v. Camp* and disclosures the government has made to Mr. Norris through his attorney. The proffer includes the following. Judge Camp entered a relationship with a white woman (referred to as "S.R.") whose boyfriend was African American. Judge Camp made racist comments, including that when African American men appeared before him, he had difficulty adjudicating their cases and determining their sentences because he could not differentiate the men from S.R.'s African American boyfriend, and that Judge Camp wished he could sentence every male African American defendant to life in prison. In addition, Judge Camp used racial epithets in conversations with S.R. and with S.R.'s landlord.

Perhaps more troubling still, the proffer includes a reference to Mr. Norris's own case: that Judge Camp said he disliked a defendant (as it turns out, Mr. Norris) and had sentenced him to 30 to 40 years in prison because the defendant had a personal relationship with a white codefendant and it reminded Judge Camp of the relationship between S.R. and her boyfriend.  This part of the proffer is curious; Judge Camp sentenced Mr. Norris not to 30 or 40 years but to life in prison (a sentence later vacated on other grounds) and did so long before Judge Camp began the relationship with S.R.

Mr. Norris also has proffered facts about Judge Camp's mental health, based on a sentencing memorandum Judge Camp submitted in his own case in February 2011.  The proffer includes the following.  Judge Camp sought treatment for depression as early as 1999.  A doctor prescribed medication that made the condition worse.  In 2000, Judge Camp suffered frontal lobe damage in a bicycle accident.  All of this contributed to a gradual but persistent personality change. Judge Camp suffered another illness, and family members also suffered illnesses, that troubled Judge Camp and contributed to his irrational, criminal behavior in 2010.

The sentencing memorandum did not suggest, and Mr. Norris's proffer does not include, any assertion that Judge Camp was not fully capable of understanding

the law and presiding over cases in 2007, when Mr. Norris's trial took place. And any such assertion could not be reconciled with the record in this case.

V

Parts of Mr. Norris's current claim fall short of establishing a constitutional violation. Judge Camp could not have been biased against Mr. Norris as a result of S.R.'s relationship with her African American boyfriend; there is no claim that Judge Camp knew or had a relationship with S.R. at that time. If, as proffered, Judge Camp claimed to have taken action against Mr. Norris on this basis, it was a mistake or perhaps an untrue statement aimed at impressing S.R. Any attempt to impress S.R. with such a statement would have been irrational—indeed bizarre—but Judge Camp was plainly acting irrationally in 2010, when he made the statement.

Similarly, Mr. Norris's proffer does not establish that Judge Camp's faculties were sufficiently impaired in 2007 to call into question his ability to preside fairly and competently over Mr. Norris's trial. At some point an impairment can rise to the level of a due-process violation. But here the proffer does not show that Judge Camp had reached that point in 2007.

This leaves for analysis the allegations that Judge Camp used racial epithets and expressed bias against male African American defendants in general and against Mr. Norris in particular. The statements were made in 2010, not in 2007

when Judge Camp presided over Mr. Norris's trial. But racial bias rarely sprouts full grown late in life; most individuals who harbored racial bias in 2010 also harbored bias in 2007. Personality changes sometimes sprout full grown late in life, especially when there is neurological damage of the kind alleged here; it thus could well be that Judge Camp was the unbiased judge he appeared to be in 2007 but lost his compass, and his filter, in the run up to 2010. Still, if, as proffered, Judge Camp expressed racial bias in 2010, he might well have been biased in 2007.

Some of the statements were admittedly made (indeed, they were recorded). Others have been proffered but not proven. The statements might or might not show actual bias, and any bias might or might not date to 2007 or earlier. But the probability of bias, based on Mr. Norris's proffer, cannot be rejected on this record. If bias, without more, would be sufficient to entitle Mr. Norris to relief, further proceedings—perhaps including an evidentiary hearing—would be required.

## VI

None of the cases cited to this point addressed the question whether collateral relief is available based on bias alone, unaccompanied by a showing of any effect on the proceeding. *Bracy* was a collateral attack, but the petitioner alleged an actual effect on the trial, and the Supreme Court held only that the petitioner was entitled to an evidentiary hearing. *Bracy* thus does not establish the standard a petitioner must meet to obtain relief.

*Caperton* was a civil case that reached the Supreme Court on direct review. And the challenged decision was made by the allegedly biased justice himself; there was no claim that the jury was biased. *Caperton* thus does not establish the standard a petitioner must meet to obtain collateral relief in a criminal case based on a biased judge's role in a jury trial. Nor does any other Supreme Court decision squarely address that issue.

More generally, the Supreme Court's decisions divide collateral attacks into two categories: those alleging "structural defects" and those alleging "trial error." *See Arizona v. Fulminante*, 499 U.S. 279, 309-10 (1991). A petitioner may obtain relief based on a structural defect without showing any actual effect on the outcome. But a petitioner may obtain relief based on trial error only by showing that the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 607, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)); *see also Ross v. United States*, 289 F.3d 677, 682 (11th Cir. 2002) ("In this Circuit, we apply the *Brecht* harmless error standard to the habeas review of federal court convictions, as well as state court convictions.").

In *Brecht*, the Supreme Court cited *Fulminante*, 499 U.S. at 307, and continued with this explanation:

> Trial error "occur[s] during the presentation of the case to the jury," and is amenable to harmless-error analysis because it "may . . . be

> quantitatively assessed in the context of other evidence presented in order to determine [the effect it had on the trial]." *Id.*, at 307–308. At the other end of the spectrum of constitutional errors lie "structural defects in the constitution of the trial mechanism, which defy analysis by 'harmless-error' standards." *Id.*, at 309. The existence of such defects—deprivation of the right to counsel, for example—requires automatic reversal of the conviction because they infect the entire trial process. *See id.*, at 309–310.

*Brecht*, 507 U.S. at 629-30 (bracketing and ellipses by the Court).

While the issue is not free of doubt, I conclude that bias of the kind alleged here is trial error, not a structural defect. Critical to the analysis are two considerations. First, this was a jury trial, not a judge trial. Second, at the time of the trial, there was neither a hint of bias nor a claim of bias. One need only read the transcript to qualitatively assess the effect of any bias on this trial.

To be sure, bias can manifest itself in subtle ways and is not always readily identified. But when there is no hint of bias—when a petitioner can identify not a single action that can be attributed to bias—qualitative assessment can be reliable.

In reaching this conclusion, I have not overlooked *Tumey v. Ohio*, 273 U.S. 510 (1927). *Fulminante* cited *Tumey* with approval as adopting a "rule of automatic reversal when a defendant is tried before a judge with a financial interest in the outcome, . . . despite a lack of any indication that bias influenced the decision." *Fulminante*, 499 U.S. at 294 (citing *Tumey*,

273 U.S. at 535).  But *Tumey* involved judge trials—the judge with the financial interest in the outcome decided whether the defendant was guilty.  Holding that automatic reversal is required when the decision maker has a financial interest in the outcome is much different from invalidating an unbiased jury's verdict because a judge who showed no sign of bias secretly harbored a bias.

One other decision should be mentioned.  In *United States v. Cerceda*, 172 F.3d 806 (11th Cir. 1999) (en banc), a district judge presided over criminal cases while, as he knew, he was a subject of a grand-jury investigation.  The Eleventh Circuit held that even if the judge should have recused himself under 28 U.S.C. § 455, the defendants were not entitled to relief.  In reaching this result, the court applied a three-factor test that applies under § 455 but has not been applied under the Due Process Clause.  The three factors are the "[1] the risk of injustice to the parties in the particular case, [2] the risk that the denial of relief will produce injustice in other cases, and [3] the risk of undermining the public's confidence in the judicial process." *Id*. at 812 (quoting *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 864 (1988)) (bracketing by the court in *Cerceda*).

*Cerceda* did not address a due-process violation or the distinction between structural defects and trial error.  Still, the decision provides at least

some support for the notion that not every case involving a judge's possible bias automatically requires the government to start over. And if applicable here, the three factors would support the denial of relief.

First, in the absence of any reason to believe any bias affected the trial, granting relief would be unjust to the government (which did not proceed in the face of any known risk of bias) and more unjust to the victims (some of whom testified reluctantly). Denying relief will not be unjust to Mr. Norris (who was convicted by an unbiased jury in a trial free of error).

Second, denying relief poses no risk of injustice in other cases. For other defendants over whose cases Judge Camp presided, the precedential value of this decision will be what it should be: a defendant will be able to obtain relief if the defendant files a timely motion and shows that bias affected the defendant's own case. For other cases involving other judges, there is no risk that denying relief will provide an incentive to repeat the conduct that got us to this point.

And third, the risk of undermining the public's confidence in the judicial process cuts both ways. It surely does not help that a defendant was convicted in a trial in which the presiding judge may have been biased. But it also will not help to set aside an unbiased jury's verdict on grounds that had no effect on the outcome. The public confidence lost through this

episode will return when the focus returns to the hundreds of unbiased judges who work in case after case to see that both sides get a fair trial.

Mr. Norris is not entitled to relief.

## VII

A defendant may appeal the denial of a § 2255 motion only if the district court or court of appeals issues a certificate of appealability.  Under 28 U.S.C. § 2253(c)(2), a certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  *Miller-El v. Cockrell*, 537 U.S. 322, 335-38 (2003); *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000); *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983); *see also Williams v. Taylor*, 529 U.S. 362, 402-13 (2000) (setting out the standards applicable to a § 2254 petition on the merits).  As the Court said in *Slack*:

> To obtain a COA under § 2253(c), a habeas prisoner must make a substantial showing of the denial of a constitutional right, a demonstration that, under *Barefoot*, includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were "adequate to deserve encouragement to proceed further."

529 U.S. at 483-84 (quoting *Barefoot*, 463 U.S. at 893 n.4).  Further, to obtain a certificate of appealability when dismissal is based on procedural grounds, a petitioner must show, "at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and

that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.* at 484.

Mr. Norris has made the required showing. This order thus grants a certificate of appealability.

## VIII

In sum, Mr. Norris has proffered facts that, if proven, would show that the judge who presided over his trial in 2007 was biased in 2010. Some of those facts are undisputed. The record does not indicate whether any bias extended back to 2007. An evidentiary hearing to address that issue is not required because the record shows that any bias did not affect the trial. An unbiased jury convicted Mr. Norris on good and sufficient evidence. For these reasons,

IT IS ORDERED:

1. Mr. Norris's motion, ECF No. 591, for relief under 28 U.S.C. § 2255, is denied with prejudice.

2. The clerk must enter judgment and close the file.

3. A certificate of appealability is granted on this issue: whether relief under 28 U.S.C. § 2255 was properly denied without an evidentiary hearing on the claim that the defendant was denied due process because the

trial judge was biased or was impaired by his neurological condition and mental health.

    SO ORDERED on December 29, 2014.

                                             s/Robert L. Hinkle
                                             United States District Judge